In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-2618

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

ELIZABETH R. ROACH,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 411—**Matthew F. Kennelly**, *Judge.*

ARGUED DECEMBER 3, 2001—DECIDED JULY 10, 2002

Before POSNER, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Elizabeth Roach embezzled more than $240,000 from her employer over a three-year period. She did this in order to repay significant debt incurred by her excessive purchases of jewelry and clothes, and to conceal that debt from her husband. Roach pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1343. At sentencing, the district court granted her motion under U.S.S.G. § 5K2.13 for a downward departure from the applicable sentencing range, finding that she committed the offense while suffering from a significantly reduced mental capacity. We conclude that the district court abused its discretion in granting the departure, and there-

fore vacate the sentence and remand the case for re-sentencing.

## I. BACKGROUND

Roach suffers from chronic depression and for most of her adult life has turned to unnecessary and excessive shopping to relieve the pain of that depression. For years, she has undergone psychiatric therapy for this behavior—which her doctors describe as compulsive shopping—and for depression. Roach's shopping binges caused a severe strain on her marriage, and she consistently engaged in behavior to hide her binges from her husband, such as having credit card statements sent to friends' homes or manipulating the entries in their checkbook. If her husband tried to prevent her from using their credit cards, she obtained new ones. Although she and her husband had a combined annual income of more than $300,000 (and considerable equity in a condominium in one of Chicago's most fashionable neighborhoods), Roach carried tens of thousands of dollars in credit card debt resulting from purchases of jewelry and clothes at upscale stores like Neiman Marcus and Barneys New York. On one occasion she applied for and obtained a store credit card and charged $10,000 that same day. Roach said that she was terrified that her husband would leave her if he discovered the extent of her shopping and shopping-related debts.

The fraud began soon after Roach was hired by Andersen Consulting as an experienced manager and later as an associate partner earning an annual salary of $150,000. It started innocently enough, when Roach submitted to Andersen an expense report seeking reimbursement for conference registration fees that she had paid using her personal charge card. When she was later unable to attend the conference, the fees were refunded, but by then, Andersen had

already processed her expense request and reimbursed her for the fees. Although she knew she should return the money, she realized that keeping the money provided an opportunity to pay some of her debt and hide the debt from her husband. After that incident, and continuing for three years until she was fired, Roach submitted expense reports that contained hundreds of incidents of falsified expenses totaling more than $240,000. The district court summarized these incidents as follows:

> The falsifications took several different forms. She padded her expenses in approximately 160 instances, obtaining just over $19,000 to which she was not entitled. On 102 occasions, she submitted expense reports for reimbursement of air fares that had actually been billed directly to Andersen, and in this way she obtained around $89,000. On twenty-five occasions, Ms. Roach requested reimbursement for conferences that she had registered for but had not attended, for a total of over $115,000. On thirteen occasions, she submitted expense reports for expenses that Andersen had already reimbursed, for a total just short of $16,000. And on three occasions, Ms. Roach sought and obtained reimbursement for personal expenses which she falsely labeled as business expenses, totaling just over $1,200. It does not appear to the Court that each of these 323 incidents of false reporting represents a separate expense report; though it is not entirely clear, it appears that they represent false line items on a somewhat smaller number of reports, though the exact amount is not clear to the Court. The total amount that she obtained from Andersen by fraud over the three years from April 1996 through April 1999 is $241,061.

Roach pleaded guilty to knowingly executing a scheme to defraud Andersen by use of a wire transmission in

interstate commerce (at least one of the false reports was sent by email from Philadelphia to Chicago) in violation of 18 U.S.C. § 1343. For purposes of sentencing, the United States Sentencing Commission Guidelines assign a base offense level of 6 to that crime. U.S.S.G. § 2F1.1. This base level was increased by 8 because her fraud involved more than $200,000, *see* U.S.S.G. § 2F1.1(b)(1)(I), and further increased by 2 levels because her offense involved more than minimal planning, *see* U.S.S.G. § 2F1.1(b)(2), resulting in an adjusted offense level of 16. The government agreed that the offense level should be reduced to 13 based on Roach's acceptance of responsibility. *See* U.S.S.G. § 3E1.1. With a criminal history category of I,[1] the prescribed sentencing range at level 13 is 12-18 months' imprisonment. U.S.S.G. § 5A. At that range, the minimum sentence must be satisfied by imprisonment, without the use of alternatives such as community confinement or home detention. *See* U.S.S.G. § 5C1.1(f) & cmt. n.8.

Roach moved for a downward departure from the guidelines range based on diminished capacity, pursuant to U.S.S.G. § 5K2.13. The district court granted her motion, finding that her offense was motivated and caused by her compulsive shopping and depression and that she had a significantly impaired ability to control her behavior. The court sentenced Roach to five years' probation, and imposed, as special conditions of probation, six weeks' work release at the Salvation Army Center, six months' home confinement with weekend electronic monitoring, and a prohibition against Roach's obtaining any new credit cards without the court's permission. The court also ordered

---

[1] Her only prior conviction was one state shoplifting charge, which occurred a few months before she was fired by Andersen. She pleaded guilty and was sentenced to 2 years' probation.

restitution in the amount of $241,061.08[2] and imposed a $30,000 fine and mandatory special assessment of $100. The government appeals the sentence pursuant to 18 U.S.C. § 3742(b)(3).

## II. ANALYSIS

We review the district court's decision to impose a sentence lower than the guideline range for abuse of discretion, which "includes review to determine that the discretion was not guided by erroneous legal conclusions." *Koon v. United States*, 518 U.S. 81, 100 (1996). We review for clear error a sentencing court's resolution of factual questions related to its decision to depart, *United States v. Crucean*, 241 F.3d 895, 899 (7th Cir. 2001), and will reverse based on clear error only if "we are left with a 'definite and firm conviction that a mistake has been committed.'" *United States v. Huerta*, 239 F.3d 865, 875 (7th Cir. 2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

Emotional and mental disorders are ordinarily not a basis for departing from the prescribed sentence. *See* U.S.S.G. § 5H1.3 (policy statement); *United States v. Pullen*, 89 F.3d 368, 370 (7th Cir. 1996). A departure may be warranted, however, if the defendant suffers from a "significantly reduced mental capacity":

> A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. . . . If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

---

[2] The restitution has since been paid in full.

U.S.S.G. § 5K2.13 (policy statement).[3] In its application note to § 5K2.13, the Commission defines "significantly reduced mental capacity," as including both cognitive and volitional impairments:

> "Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

U.S.S.G. § 5K2.13, cmt. n.1. We have interpreted § 5K2.13 as requiring that the impairment be both (1) sufficiently serious and (2) connected to the offense. *United States v. Frazier*, 979 F.2d 1227, 1230 (7th Cir. 1992); *United States v. Gentry*, 925 F.2d 186, 189 (7th Cir. 1991).

## A.   Connection to the Offense

On appeal, the government does not seriously dispute the district court's finding that Roach had a significantly impaired ability to control her shopping, or that either her depression or compulsive shopping disorder motivated her crime. Instead, the government argues that the district court erred in holding that an impairment that provides the motive is a sufficient "connection" to the offense under § 5K2.13. In the government's view, for volitional impairments, the compulsive behavior must be the behavior

---

[3]   The portion of § 5K2.13 omitted here prohibits a departure under circumstances that the government agrees are not relevant to this case: if (1) the impairment was caused by the defendant's voluntary use of drugs or other intoxicants; (2) the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. U.S.S.G. § 5K2.13.

constituting the offense, and not some other behavior that explains the motive. We agree with the government that § 5K2.13 requires more than a connection between the impairment and the motive because motive does not address the critical question—what was the defendant's mental capacity when she committed the offense?

We begin with the Eleventh Circuit's opinion in *United States v. Miller*, 146 F.3d 1281, 1286 (11th Cir. 1998), which supports our view that an impairment that provides a motive is insufficient under § 5K2.13. In *Miller*, the defendant claimed his compulsion for viewing adult pornography caused him to trade in child pornography (the offense for which he was convicted) because his trade in child pornography facilitated his acquisition of adult pornography. The Eleventh Circuit held that the defendant's offense of possession of child pornography was no more related to his compulsion to view adult pornography "than if he had robbed someone in order to use the proceeds to purchase adult pornography." *Id.* The court explained:

> The impulse was related to viewing pornography, but was not related to the means of obtaining the pornography. A departure under § 5K2.13 requires that the reduced mental capacity contribute to the offense. The experts' testimony merely showed that the impulse control disorder explained his interest in adult pornography, but it failed to establish that the disorder caused him to trade child pornography, which is the offense for which he was being sentenced.

*Id.* Rejecting the district court's finding that the defendant had a significantly impaired ability to refrain from the offense conduct, the court held that the departure for diminished capacity was improper and vacated the sentence. *Id.*

In response, Roach relies on *United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000), in which the Sixth Circuit rejected the argument that, under § 5K2.13, the compulsive behavior must be the behavior constituting the offense. In *Sadolsky*, the defendant, a compulsive gambler, defrauded his employer over a six-month period by crediting returned merchandise to his personal credit card. The district court granted a departure for diminished capacity, based on the defendant's claim that he committed the fraud in order to pay off his gambling debts. On appeal, the government argued that a departure under § 5K2.13 was not available because the offense at issue was fraud, and not illegal gambling. The Sixth Circuit disagreed, holding that § 5K2.13 does not require a "direct link" between the defendant's impairment and the crime, noting that the guideline does not distinguish between impairments "that explain the behavior that constituted the crime" and impairments "that explain the behavior that motivated the crime." 234 F.3d at 943. The court reasoned that the distinction urged by the government could lead to "arbitrary" results in cases in which the impairment was the "driving force" behind the crime but the connection with the offense was not "direct":

> For example, under the Government's theory, if someone with an eating disorder stole food, he or she would be entitled to a downward departure under § 5K2.13. If, however, that same person stole money to buy food, he or she would not be entitled to a downward departure. In the latter situation, the link between the crime, stealing money to buy food, and the [impairment], an eating disorder, is no longer technically direct. Nonetheless, no one can dispute that the eating disorder is the driving force behind the crime. Yet under the Government's theory, the two individuals would be treated differently based on a nebulous distinction between a

> volitional impairment that causes the conduct that constitutes the crime and a volitional impairment that explains the motive for the ultimate crime.

*Id.*

We agree with the Sixth Circuit that the distinction between "direct" and "indirect" causes does not determine whether § 5K2.13 applies. The distinction drawn in the hypothetical posed in *Sadolsky* is a bit of a straw man, however. In neither example is the connection between the impairment and the offense strictly "direct"; one with an eating disorder presumably has a compulsion to eat, not to steal. In other words, even in the example of the defendant who stole food rather than money (a connection that *Sadolsky* labels "direct"), we still don't know how his eating disorder was connected to the offense. For example, did he have money to buy the food but stole it anyway? Classifying the connection between the impairment and the offense as direct or indirect does not tell us anything about the strength of that connection or indeed whether the impairment has any relevance in determining the appropriate sentence.

Likewise, understanding the defendant's motive does not necessarily reveal anything about the defendant's mental capacity at the time of the offense, which is the proper focus of the inquiry for purposes of § 5K2.13. *See Frazier*, 979 F.2d 1227, 1230 n.2 ("Section 5K2.13 focuses the inquiry on the defendant's mental capacity *when she committed the offense*.") (emphasis in original); *United States v. Greenfield*, 244 F.3d 158, 162 (D.C. Cir. 2001) ("defendant's mental capacity must have been significantly reduced *at the time he committed the offense*.") (emphasis in original). Although the definition of significantly reduced mental capacity does not expressly link volitional impairments to the offense conduct, referring instead to the ability "to control behavior that the defendant knows is wrongful,"

§ 5K2.13 supplies that link by specifying that a departure may be considered if the "defendant committed the offense *while suffering* from a significantly reduced mental capacity." U.S.S.G. § 5K2.13 (emphasis added); *see Frazier*, 979 F.2d at 1230 (holding that the district court incorrectly applied § 5K2.13 by granting a departure without a finding about the defendant's mental capacity at the time of the offense); *Miller*, 146 F.3d at 1285 ("§ 5K2.13 requires that the diminished capacity be linked to the commission of the offense."). In this case, the behavior at issue at the time of Roach's offense is her submission of false expense reports, not her shopping.

Similarly, the district court's finding that Roach would not have committed the offense had it not been for her shopping disorder, without more, cannot support the departure. As we explained in *United States v. Dyer*, 216 F.3d 568 (7th Cir. 2000), but-for causation is a very weak sense of causation:

> But for [defendant's] having been born, he wouldn't
> have operated a Ponzi scheme; but it would be odd,
> in fact incorrect, to say that his birth (or the birth
> of his parents or grandparents) caused his crime.

216 F.3d at 570. Roach's compulsive shopping may well have been a necessary cause of her offense and even, in the district court's words, the "driving force" behind it. But like motive, this finding reveals nothing about Roach's mental capacity when she committed the fraud, and therefore does not establish diminished capacity for purposes of § 5K2.13.

This is not to say, as suggested by the government's argument, that a shopping compulsion could only be relevant to sentencing for shoplifting, for example, or a gambling compulsion only to sentencing for illegal gambling. There may well be circumstances when such a disorder not only provides the motive for the offense, but also significantly impairs the defendant's ability to control the

conduct with which she is charged, such as if the defendant's impairment had manifested itself in episodes of significantly reduced judgment or control at the time of her shopping sprees and also when she committed the fraud.[4] In sum, section 5K2.13 requires an assessment of the defendant's mental capacity at the time of the offense. It is in making this assessment that the district court's analysis and findings fall short.

B.   Evidence of Roach's Mental Capacity

In concluding that the departure was warranted, the district court found, "[i]n the words of Guidelines § 5K2.13 and its application notes," that "Roach committed the offense while suffering from a significantly reduced mental capacity, in that she had a significantly impaired ability to control behavior that she knew was wrongful." It is not entirely clear from the court's opinion whether this finding includes Roach's ability to control her conduct at the time of her offense—that is, her submission of fraudulent expense reports. If it does not, the departure was, as we just explained, an incorrect application of § 5K2.13. But to the extent the judge's conclusion can be read to include a finding that Roach had a significantly impaired capacity to control her conduct at the time of the offense, it is unsupported by the evidence and clearly erroneous.

---

[4]  *Sadolsky* implies that a departure may be warranted if, because of financial circumstances, the offense was necessary in order to satisfy the compulsion. *See* 234 F.3d at 943 (noting that the defendant had "maxed out" his credit line before resorting to fraud). Roach does not make any such argument, so we need not address this question, or address the government's argument that a departure under those circumstances would be barred by U.S.S.G. § 5K2.12, which states that "personal financial difficulties and economic pressure upon a trade or business do not warrant a decrease in sentence."

The district court had before it statements from doctors who examined Roach, as well as evidence about Roach's history relating to her compulsive shopping binges and the activities surrounding those binges. The district court found that Roach was "not able fully to control the things she did in order to allow her to continue to carry out [her shopping] compulsion," pointing to evidence that she had consistently engaged in activities to "facilitate and conceal" her shopping, such as paying for groceries with checks written for amounts above the purchase amount, obtaining new credit cards, having bills sent to friends' houses, and borrowing money from relatives to pay her credit card debt. While this evidence might perhaps indicate a lack of control with respect to those (lawful) activities, it does not shed light on her mental capacity at the time she engaged in the fraudulent conduct.

The doctors' statements are similarly inadequate to support a finding that Roach had a significantly impaired ability to control her conduct at the time of her offense. Dr. Jeffrey Roth, a psychiatrist who treated Roach, did not offer an opinion on that subject, but stated that "it is a consistent diagnostic criterion that these individuals [who suffer from compulsive shopping disorders] can desperately commit illegal acts such as forgery or theft to finance their illness and hide their debt from family and others." Notably missing from Dr. Roth's statement is any conclusion that this aspect of the disorder even applies to Roach or, if it did, any assessment of the role it played at the time of her offense. *Cf. Greenfield*, 244 F.3d at 163 (expert's testimony that "if a depression is severe enough, . . . it could significantly reduce someone's mental capacity" could not support a departure under § 5K2.13).

Unlike Dr. Roth, Dr. Robert Galatzer-Levy, who evaluated Roach at the request of the defense, did conclude that Roach had a significantly reduced mental capacity both during her shopping binges and when she submitted the false expense reports:

> During both the compulsive shopping and the commission of the charged offense Mrs. Roach appears to have been functioning in a dissociated state in which information about the legal, practical and moral consequences of her actions was not effectively available to her. This constitutes a significant reduction in her mental capacity at the time of commission of the charged offense.

With respect to his conclusion about Roach's mental state while shopping, Dr. Galatzer-Levy explained his reasoning, which the district court summarized as follows:

> [C]ompulsive shopping is one of several ways that persons suffering from severe depression attempt to relieve the effects of their depression. Other such "self-medicating" activity of this type can include alcohol consumption, compulsive eating, gambling, or sexual activity. Some researchers believe that this type of behavior temporarily increases the person's available level of serotonin, a neurotransmitter that, among other things, determines the extent and severity of depression, and thus provides temporary relief from the person's symptoms. During this activity, the person is in a dissociative state in which information that ordinarily would influence the person's behavior does not do so. In short, the types of concerns that would prevent most people from engaging in such activity, such as recognition of the financial implications, disapproval of family members, or simple common sense, are simply not at work.[5]

By contrast, Dr. Galatzer-Levy offers no explanation of the reasoning behind his conclusion that Roach had a

---

[5] Dr. Arnold Goldberg offered a similar opinion about Roach's mental state during her shopping binges.

significantly impaired ability to control her behavior at the time of her offense. His statement fails to reconcile its apparent inconsistency with Roach's own statements that she began the fraud after inadvertently discovering that she could be paid by her employer for expenses relating to conferences she had cancelled. According to Roach, she kept the money after realizing that it was a way to pay off her debt and conceal it from her husband. Given these statements, the episodic nature of her impairment, and the fact that Roach had "self-medicated" her depression and compulsively shopped for more than ten years without any criminal activity, the analytic leap from a shopping compulsion to a significantly impaired ability to control fraudulent conduct spanning three years is too great to make without supporting reasons or evidence. Dr. Galatzer-Levy's naked conclusion about Roach's mental state at the time of the offense is therefore entitled to little, if any, weight. *See Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

Dr. Paul Pasulka's report, prepared at the request of the government, is similarly unhelpful. Dr. Pasulka concludes that Roach was not fully able to control unspecified wrongful behavior, but does not say that her impairment was significant. Like Dr. Galatzer-Levy, Pasulka supplies little in the way of evidence or reasoning supporting his conclusion, and his only observation about Roach's offense conduct—that she defrauded her employer in an attempt to hide her behaviors—tends to undermine, rather than support, a finding that Roach had a significantly impaired capacity to control her conduct at the time of the offense.

### III.  CONCLUSION

We have no doubt that Roach's depression and shopping have had a profound impact on her life. In this way she is like countless criminal defendants who come before the court from all walks of life with a wide variety of personal characteristics that suggest a basis for leniency. The sentencing guidelines, however, significantly limit a district court's ability to fashion a sentence based on such considerations. Those guidelines prescribe a particular sentencing range, which in this case was driven by the magnitude of Roach's fraud. We are mindful that our review of the district court's decision to impose a sentence below this range is deferential, but are convinced that the court abused its discretion in granting a downward departure based on § 5K2.13. Its findings on Roach's motive do not establish the critical issue of her mental capacity at the time of the offense, and on that issue, there is no evidence to support the court's conclusion that Roach had a significantly impaired ability to control her behavior. Roach's sentence is therefore VACATED and the case REMANDED for resentencing.

A true Copy:

      Teste:

 

*Clerk of the United States Court of
Appeals for the Seventh Circuit*