In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1266

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER MCILRATH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06-CR-182—**J. P. Stadtmueller**, *Judge.*

ARGUED NOVEMBER 14, 2007—DECIDED JANUARY 10, 2008

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendant pleaded guilty to the crime of traveling across state lines to have sex with a minor, in violation of 18 U.S.C. § 2423(b), and was sentenced to 46 months in prison. That is the bottom of the applicable sentencing guidelines range, but he challenges the sentence as too severe, arguing that he should have been sentenced just to home confinement.

The defendant was caught in a standard Internet sting. A detective entered a chat room pretending to be a 15-year-old girl. She received a message from the defendant ask-

ing her whether she wanted to chat. When she replied affirmatively he engaged her in sex talk that led eventually to his proposing that he travel to her city (which was in a different state) to have sex with her. She agreed; he went there and was arrested. In another chat, a copy of which was found on his computer, he had persuaded a 12-year-old girl to agree to have sex with him, although apparently they never did.

The defendant was 31 years old when he committed the crime and had no criminal record. He was a loner who had not had sex until the previous year, with a woman who then rejected him, breaking his heart and (he claimed) precipitating the incidents with the 12- and (supposed) 15-year-old girls. A forensic psychologist named Eric Ostrov opined that the defendant had been driven to commit the crime after suffering for years from low self-esteem and poor body image. Dr. Ostrov estimated that there was a 9-to-13 percent risk of the defendant's repeating his crime, although he thought the risk could be reduced by counseling and psychotropic medication. He further opined that prison would be devastating for the defendant; he "would have almost no resources for coping with prison life" and would be a "target for predators." The defendant's father asked for leniency for his son because of both parents' ill health. He also noted the defendant's cooperation with the government, solid record of employment, and charitable work. The defendant echoed his father and added that he had lost his job and his savings (plus his car, forfeited as an instrumentality of the crime) as a result of his conviction.

The judge gave extended consideration to the mitigating factors urged by the defendant's lawyer. But he did

not think they justified a below-guidelines sentence. He was rather dismissive of psychological evidence, remarking that persons in the defendant's position "hire very expensive psychotherapists, psychologists, psychiatrists, counselors and come into court and plead with my colleagues in other parts of the country to have a sentence of probation." He stated that the kind of preying on minors, with the aid of the Internet, that the defendant engaged in "is a deadly, deadly, serious problem that we have as a society," and "there are many, many more Marias [the detective's stage name was Maria] out there who are actual victims, who have the same emotional scars, perhaps even deeper than the scars that are confronting you on a day like today; and we as a society have found, unfortunately, no better way to deal with this serious, serious problem other than to incapacitate or remove individuals from the community for a period of time not only as a form of punishment but a form of deterrence not only to you personally but deterrence to others who may find themselves similarly situated."

These and similar remarks of the judge at sentencing discharged his duty to consider not only the sentencing guidelines, but also the sentencing factors set forth in 18 U.S.C. § 3553(a), the most important of which we quote once again:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

\*    \*    \*

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The judge balanced the history and characteristics of the defendant, which argued for leniency, against the retributive and deterrent ends to be served by the 46-month sentence. There was no need for him to consider explicitly the need to avoid unwarranted sentence disparities, as there is no suggestion that the guidelines sentence was out of line with what other defendants with similar records who engage in the same criminal conduct receive. The result of the judge's balancing of competing considerations was reasonable and so binds us.

His statement that preying on minors with the aid of the Internet is a serious problem is supported by a study that found that approximately one in five minors per year receives an unwanted sexual solicitation online, while one in 33 receives a more aggressive solicitation in which the offender asks to meet the minor or calls or sends him or her something. David Finkelhor, Kimberly J. Mitchell & Janis Wolak, "Online Victimization: A Report on the Nation's Youth" 1 (National Center for Missing and Exploited Children June 2000), www.missingkids.com/en_US/publications/NC62.pdf (visited Dec. 4, 2007). Only 25 percent of those solicited told a parent about it, and only a fraction of the solicitations were reported to authorities. *Id*. at 4.

The defendant's history and characteristics were relevant in possibly suggesting both that imprisonment would be a more severe punishment for him than for the average Internet sexual predator, which would argue for a lower prison sentence, and that he is less likely to repeat his crime than the average such offender, which would also argue for a lower prison sentence. The first point goes to the retributive ("just punishment") and general-deterrence factors in section 3553(a), the second to specific deterrence (to protect the public from further crimes by *this* defendant). But neither was very persuasive. As far as we know or the defendant's lawyer or psychologist attempted to show, the average man who trolls for young girls in Internet chat rooms is no better adjusted than the defendant. It is true that a sexual interest in teenage girls is not abnormal in the sense that pedophilia is; any female of reproductive age is a natural object of desire on the part of a male, whether in our species or any other. But the 12-year-old girl whom the defendant propositioned may well have been prepubescent, and he seemed not to care; and given that sex with 12- and 15-year-olds is deemed a very serious crime in our society, especially when the man is much older, a 31-year-old man who tries to seduce these young teenagers in Internet chat rooms is unlikely to be well adjusted.

The guidelines sentencing ranges are designed with reference to the average offender in each crime category to which a given range applies. *United States v. Goff*, 501 F.3d 250, 260-61 (3d Cir. 2007). So if a particular defendant is average, his case for a sentence below the range is weak. See *id*. at 261. As far as the record (or our independent research) discloses, the psychological characteristics of our defendant are average for Internet sexual predators.

With regard to the probability of his repeating his crime, the absence of a comparative dimension again undermines the defendant's case. Is a 9-to-13 percent probability higher or lower than the average probability of recidivism by persons who commit the defendant's crime? Only if it is lower would it be a reason for a below-guidelines sentence. Cf. *United States v. Goff*, *supra*, 501 F.3d at 261 n. 17. For all sex offenses, "the observed sexual recidivism rate is typically 10% to 15% after 5 years." R. Karl Hanson & Kelly E. Morton-Bourgon, "The Characteristics of Persistent Sexual Offenders: A Meta-Analysis of Recidivism Studies," 73 *J. Counseling & Clinical Psych.* 1154 (2005). We have not found an estimate for Internet preying on minors, but the Sentencing Commission may not have found one either, and so may have assumed, in choosing the guidelines range for our defendant's crime, a probability of recidivism equal to that of sex offenders in general—which is approximately the probability that Dr. Ostrov predicted for the defendant.

And how valid was Dr. Ostrov's prediction, a prediction of a specific person's likely rate of recidivism rather than an average rate across heterogeneous sex crimes? Has the algorithm that Ostrov used to derive the 9-to-13 percent estimate—Static 99—been validated by methods accepted in the psychological community? Would it satisfy the standard in *Daubert* or in Rule 702 of the Federal Rules of Evidence? We are not told.

We are not even told what "Static 99" is. Of course one can look it up, and when one does one finds that what it does is try to match a sex offender's characteristics to characteristics found in studies of convicted sex offenders to be correlated with recidivism, such as age (though only whether the offender is over 25), prior sexual offenses,

and whether he has lived with someone for at least two years with whom he had a sexual relationship. See, e.g., R. Karl Hanson & David Thornton, "Static 99: Improving Actuarial Risk Assessments for Sex Offenders" (1999), http://ww2.ps-sp.gc.ca/publications/corrections/199902_e.pdf (visited Dec. 4, 2007); Andrew Harris et al., "STATIC-99 Coding Rules (revised 2003), http://ww2.ps-sp.gc.ca/publications/corrections/pdf/Static-99-coding-rules_e.pdf (visited Dec. 4, 2007). Our defendant's characteristics matched those of offenders 9-to-13 percent of whom were found to have repeated their offense.

The methodology employed by Static 99 to predict the probability of recidivism has been accepted in a number of cases. See, e.g., *In re Commitment of Simons*, 821 N.E.2d 1184, 1192 (Ill. 2004); *In re Detention of Thorell*, 72 P.3d 708, 726 (Wash. 2003); *In re Commitment of Tainter*, 655 N.W.2d 538 (Wis. App. 2002); *In re Commitment of R.S.*, 773 A.2d 72, 75 (N.J. Super. Ct. App. Div.), aff'd, 801 A.2d 219 (N.J. 2002) (per curiam); see Eric S. Janus & Robert A. Prentky, "Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility and Accountability," 40 *Am. Crim. L. Rev.* 1443, 1472-75 (2003). Not that it is perfect (what is?); even its advocates claim only "moderate predictive accuracy." Harris et al., *supra*, at 3. It may be more accurate than clinical assessments, Janus & Prentky, *supra*, at 1455-58, but that may not be saying much. Estimates of recidivism are bound to be too low when one is dealing with underreported crimes such as sex offenses. Static 99 treats as a recidivist only someone who is *convicted* of a further sex offense, but the recidivism concern is with someone who commits a further offense, whether or not he is caught—yet if he is not caught, his subsequent crime does not affect the data on which the Static 99 calibrations are based.

These and other problems with efforts to predict recidivism from offenders' characteristics (such as the limited number of potentially relevant characteristics considered by the Static 99 algorithm—education and occupation, for example, or finer age gradations than just 25 or older, are excluded) have engendered skepticism. Center for Sex Offender Management, "Recidivism of Sex Offenders" (May 2001), www.csom.org/pubs/recidsexof.html (visited Nov. 29, 2007); Richard Wollert, "Low Base Rates Limit Expert Certainty When Current Actuarials Are Used To Identify Sexually Violent Predators: An Application of Bayes's Theorem," 12 *Psychological Pub. Policy & L.* 56 (2006).

Evidence does not have to be admissible at a trial in order to be considered in a sentencing hearing, which is not governed by the rules of evidence. E.g., *United States v. Goodwin*, 496 F.3d 636, 642 (7th Cir. 2007); *United States v. Birk*, 453 F.3d 893, 899 (7th Cir. 2006); *United States v. Leekins*, 493 F.3d 143, 149-50 (3d Cir. 2007); U.S.S.G. § 6A1.3(a). Static 99 may be a good place to start an analysis of the likelihood of a specific defendant's repeating his crime—but not to end it. Robert A. Prentky et al., "Sexually Violent Predators in the Courtroom: Science on Trial," 12 *Psychological Pub. Policy & L.* 357, 384-85 (2006). In any event, without any effort by the defendant's lawyer to establish the reliability of Dr. Ostrov's methodology—or even to explain it—the judge was entitled to discount his prediction, *United States v. Beier*, 490 F.3d 572, 574 (7th Cir. 2007). He was entitled to discount not only the estimate of a 9-to-13 percent probability of recidivism but also the unsubstantiated claim that the range could be reduced by counseling; the efficacy of treatment programs for sex offenders has not been demonstrated. Hanson & Morton-Bourgon, *supra*, at 1159.

Nor did Dr. Ostrov comply with proper Static 99 protocol, which requires the evaluator to include with the offender's Static 99 score a statement as to whether the evaluator considers the score an accurate representation of the offender's risk of recidivism, given characteristics of the offender excluded from the Static 99 assessment. "Appendix Seven: Suggested Report Paragraphs for Communicating STATIC-99-based Risk Information," in Harris et al., *supra*, at 71.

But we should consider the possible bearing on our analysis of the Supreme Court's decision last month in *Gall v. United States*, 2007 WL 4292116 (U.S. Dec. 10, 2007). The Court held that a sentence outside the guidelines range must not be presumed unreasonable by the appellate court, which also may not hogtie sentencing judges with a rigid formula for determining whether the justification for an out-of-range sentence is "proportional" to the extent of the sentence's deviation from the range. Neither approach had been followed by this court. Even before *Rita v. United States*, 127 S. Ct. 2456 (2007), our court, anticipating *Gall* in this respect, rejected the notion that a sentencing judge can presume the reasonableness of a sentence within the guidelines range—rejected it emphatically. "The judge is not required—or indeed permitted—to 'presume' that a sentence within the guidelines range is the correct sentence and if he wants to depart give a reason why it's not correct. All he has to do is consider the guidelines and make sure that the sentence he gives is within the statutory range and consistent with the sentencing factors listed in 18 U.S.C. § 3553(a). His choice of sentence, whether inside or outside the guideline range, is discretionary and subject therefore to only light appellate review. The applicable guideline nudges him toward the

sentencing range, *but his freedom to impose a reasonable sentence outside the range is unfettered.*" *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006) (citations omitted, emphasis added); see also *United States v. Griffin*, 493 F.3d 856, 868 (7th Cir. 2007).

With specific reference to out-of-range sentences, we had said, again before the Supreme Court's decision in *Gall*, that "when the guidelines, drafted by a respected public body with access to the best knowledge and practices of penology, recommend that a defendant be sentenced to a number of years in prison, a sentence involving no (or, as in this case, nominal) imprisonment can be justified only by a careful, impartial weighing of the statutory sentencing factors." *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007). We reversed in *Goldberg* because we found the district judge's weighing of the statutory sentencing factors that guide the judge in deciding whether to give a sentence outside the guidelines range to have been "unreasonable," *id.*—the standard later announced in *Gall*. While disapproving sentencing presumptions and rigid formulas, the Supreme Court made "clear" in *Gall*, as we had tried to do in *Goldberg*, "that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall v. United States*, *supra*, at *6. "[A] major departure should be supported by a more significant justification than a minor one." *Id.* at *7.

The judge in this case gave a guidelines sentence, and since, as we have explained, his decision not to give a sentence beneath the guidelines range was reasonable, there is no basis in *Gall* for invalidating the sentence.

Indeed, the emphasis that the Supreme Court in *Gall* placed on sentencing discretion (see, e.g., *id*. at *8), in the course of rejecting the tight girdle (amounting in the Supreme Court's view to de novo review, see *id*. at *12) that the Eighth Circuit had placed on that discretion, reinforces our conclusion that the sentence meted out in this case, because it is reasonable, must be

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*