In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3097

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DENNIS GARTHUS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 441-1—**William J. Hibbler**, *Judge.*

ARGUED JUNE 14, 2011—DECIDED JULY 14, 2011

Before POSNER, ROVNER, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendant pleaded guilty to federal crimes of transporting, receiving, and possessing child pornography and was sentenced to 360 months in prison. 18 U.S.C. §§ 2252A(a)(1), (a)(2)(A), (a)(5)(B). The guidelines sentencing range was 360 months to life; the statutory minimum sentence was 180 months; he was 44 years old when sentenced. His appeal challenges his sentence on several grounds, of which the one most

emphasized by defense counsel is that the district court improperly failed to consider her argument that the defendant had had "diminished capacity" to avoid committing the crimes, a ground recognized by the sentencing guidelines as a possible justification for a lower sentence. U.S.S.G. § 5K2.13; *United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007); *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005); *United States v. Utlaut*, 497 F.3d 843, 845 (8th Cir. 2007).

When arrested, the defendant had in his possession some 2000 downloaded photographs and videos of prepubescent girls, most between 4 and 9 years old, engaged in sexual activities; many of the photographs and videos depicted violent sexual assaults on the children. Ten years earlier he'd been convicted in an Illinois state court, and served a year in prison, for an offense involving child pornography—and more: he had made a video of himself cutting off a 14-year-old girl's panties and touching her vagina. He had been molesting her since she was 10.

The defendant's sexual interests focus on prepubescent girls wearing panties (his screen name was Pantielover); he is also attracted to adult women, at least when they are wearing pantyhose, but he has never had a girlfriend or, apparently, any adult sexual relationship. He has been diagnosed with "pedophilia, sexually attracted to females, nonexclusive type."

Diminished capacity in federal sentencing law refers to cognitive or psychological limitations that fall short of insanity, severe mental retardation, or dementia but

contributed in one of two ways (or both) to the crime for which the defendant is being sentenced: by re-ducing—though not eliminating—his ability to ap-preciate the wrongfulness of his acts, or by reducing his ability to avoid committing them. U.S.S.G. § 5K2.13 Application Note 1; *United States v. Roach*, 296 F.3d 565, 568 (7th Cir. 2002). It is thus an attenuated version of the standard insanity defense.

Why diminished capacity in this sense (or senses) should be a mitigating factor in sentencing is obscure. The diminution makes a defendant more likely to repeat his crime when he is released from prison. That is especially so when the crime involves compulsive behavior, such as behavior driven by sexual desire. *United States v. Rogers*, 587 F.3d 816, 821 (7th Cir. 2009); *United States v. Cunningham*, 103 F.3d 553, 556 (7th Cir. 1996); *Doe v. Sex Offender Registry Board*, 857 N.E.2d 473, 482-83 (Mass. 2006); *People v. Earle*, 91 Cal. Rptr. 3d 261, 282-83 and n. 16 (App. 2009). Such behavior requires active resistance by the person tempted to engage in it, if it is to be avoided; and diminished capacity weakens the ability to resist. One of the defendant's experts opined that the defendant's ability to resist could be strengthened substantially with medication and therapy. But both defense experts believed, and defense counsel argued, that he wouldn't get proper treatment in prison. That is very damaging to the argument that he won't recidivate, since by virtue of the statutory minimum he will spend many years in prison and when released may be unable to resist his criminal impulses because his condition will not have been treated effectively in prison.

From a "just deserts" standpoint, diminished capacity argues for a lighter sentence, but from the standpoint of preventing recidivism it argues for a heavier one. The heavier sentence may not deter a criminal from repeating his crime when he is released (that is implied by saying he has diminished capacity), but it will reduce his lifetime criminal activity by incapacitating him for a longer time than if he received a lighter sentence.

How to choose? The sentencing guidelines do not embody a coherent penal philosophy. *United States v. Blarek*, 7 F. Supp. 2d 192, 203-04 (E.D.N.Y. 1998); Paul J. Hofer & Mark H. Allenbaugh, "The Reason behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines," 40 *Am. Crim. L. Rev.* 19, 26-36 (2003). "The [Sentencing] Commission's conclusion can be summarized thus: since people disagree over the aims of sentencing, it is best to have no rationale at all." Andrew von Hirsch, "Federal Sentencing Guidelines: Do They Provide Principled Guidance?," 27 *Am. Crim. L. Rev.* 367, 371 (1989). In the case of diminished capacity the guidelines have embraced a just-deserts theory; but why it has done so—why it has in this instance elevated just-deserts considerations over the interest in preventing recidivism—is not explained. In any event, under the *Booker* regime a sentencing judge can adopt his own penal philosophy. *United States v. Corner*, 598 F.3d 411, 416 (7th Cir. 2010) (en banc); *United States v. Herrera-Zuniga*, 571 F.3d 568, 585 (6th Cir. 2009). And so he can disregard the guidelines' classification of diminished capacity as a mitigating factor, regard it as an aggravating factor, or regard it as a wash.

The defendant argues that the district judge ignored the issue of diminished capacity. In response to a harangue by defense counsel and a detailed response to it by the prosecutor, all the judge said was that "the Court was struck with Mr. Garthus' somewhat troubled upbringing. There are many persons in our society who have struggles . . . . Certainly the Court takes note that there may be issues which have not been properly addressed with regards to Mr. Garthus. The Court is aware of his physical ailments . . . . [Defense counsel is] convinced that Mr. Garthus with the proper treatment will not reoffend . . . but the Court does not share it. I don't think there is any guarantee that anyone can give that this urge which Mr. Garthus has will not reemerge once he is given the opportunity to do so . . . . The Court believe[s] that the Guidelines are reasonable under the circumstances. And the Court can find no justification to depart from the recommended guidelines." (The judge's mention of "physical ailments" was in reference to a different mitigation argument made by defense counsel.)

Ordinarily a sentencing judge's failure to address the defendant's principal argument for lenience would be a reversible error. *United States v. Villegas-Miranda*, 579 F.3d 798, 801-02 (7th Cir. 2009); *United States v. Cunningham, supra*, 429 F.3d at 679; *United States v. Olhovsky*, 562 F.3d 530, 547, 552 (3d Cir. 2009); see generally *Rita v. United States*, 551 U.S. 338, 356-57 (2007). But diminished capacity was not argued by defense counsel at the sentencing hearing; the term was not even mentioned, though the defendant's cognitive

and psychiatric deficiencies were; and it is unsubstanti-
ated.

The defendant suffers from attention-deficit disorder/
hyperactivity disorder, dyslexia, depression, and anxiety.
He also, according to one of the defense experts, suffers
from "chronic and persistent intellectual or cognitive
limitations." He has an IQ of 83. Mean IQ is of course 100,
and the standard deviation is 15. This means that two-
thirds of the population have an IQ between 85 and 115,
and 16.67 percent (one-half of one-third) have an IQ
under 85. A person with an IQ of 83 is not bright, though
he is not intellectually disabled either. But neither
defense expert, nor defense counsel in either her sen-
tencing memorandum or her lengthy remarks at the
sentencing hearing, mentioned any evidence that the
defendant's mental condition had impaired his ability
either to have appreciated the wrongfulness of what he
was doing or to have refrained from doing it. The experts
opined that the defendant's cognitive and psychiatric
problems might have contributed to his pedophilia, for
example by making him too shy to form a sexual relation-
ship with an adult—although it was never explained why
that would generate a desire for child pornography rather
than adult pornography. But they didn't say those prob-
lems had impaired his understanding of the wrongful-
ness of his behavior or made it more difficult for him
than for a person without his cognitive and psychiatric
problems to control his desire to collect illegal porno-
graphic images.

At the sentencing hearing, where as we said no one
mentioned "diminished capacity," defense counsel went

off in other directions, some distinctly unpromising, as when she repeatedly referred to her client as being the "victim." At one point she called him "a victim in the most extreme sense." As a child he had been beaten and called stupid by his father, and his mental problems had never been treated or even diagnosed before his arrest. He also has a heart condition. But he has never been sexually abused and his "victimization" is hardly comparable to that of the children in the pornography that he downloaded or of the girl whom he had molested.

Relying mainly on the psychiatric expert's report (the other expert was a psychologist), defense counsel further argued that her client, despite his molestation of a girl, was not a "predator," defined by the lawyer as one who commits "hands-on child abuse or some sort of actual contact." She said that he is shy, and she pointed out that his victim had been a relative, and she argued that he would never approach a girl who was not a relative. She noted that the psychiatrist had termed the defendant "a low risk for breaking the law in the future" because he showed "good judgment" during the interview by the psychiatrist and expressed empathy for the "plight" of the children whose images he had collected. These are gossamer-thin grounds for a prediction about his future sexual behavior. The lawyer didn't mention the psychiatrist's further statement that the defendant's "pedophilic fantasies are chronic and not likely to change over time, even with continued therapy." Nor did she mention that almost the entire emphasis of his report, so far as the likelihood of recidivism was concerned, was that the defendant was "not likely to act out [his pedophilic]

fantasies by sexually approaching underage females." So just as in *United States v. Coopman*, 602 F.3d 814, 818 (7th Cir. 2010), the expert "undermined the relevance of his testimony" by focusing exclusively on the likelihood that a child-pornography offender would commit a "hands-on" offense and ignoring the likelihood that he would commit future child-pornography offenses.

At the sentencing hearing defense counsel's main argument was that the defendant was unlikely to commit further sex crimes if released after 180 months, when he would be almost 60 years old. (Actually, if sentenced to 180 months, he would be released after 157 months—a little over 13 years, not 15—if he behaved himself in prison. See 18 U.S.C. § 3624(b); *Barber v. Thomas*, 130 S. Ct. 2499, 2502-03 (2010).) That's a different argument from diminished capacity, and indeed, as we said earlier, in tension with it and unsubstantiated to boot.

The judge was unpersuaded that the defendant would forgo criminal activity after release from prison, and given the absence of contrary evidence he was not required to do more than register his disagreement. That the defendant is shy and his one "hands-on" victim a relative and that he exhibited "good judgment" and "empathy" in his interview by the psychiatrist do not ensure that he won't find another "hands-on" victim when he is released from prison, or resume collecting and disseminating child pornography.

We need evidence-driven law just as we need evidence-driven medicine. Statistical analysis of sex crimes has

shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children. R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 *Annals of the N.Y. Academy of Sciences* 154, 157 (2003) (tab. 1). Some studies show a high rate of recidivism among pedophilic sex offenders generally, ranging from 10 percent to 50 percent. Ryan C.W. Hall & Richard C.W. Hall, "A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues," 82 *Mayo Clinic Proceedings* 457, 467 (2007). Another study found that only 6.8 percent of consumers of child pornography had been charged with a new child-pornography offense within 4 years but that the percentage rose to 9.5 percent within 6 years. Angela W. Eke, Michael C. Seto & Jennette Williams, "Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-up Study," *Law & Human Behavior*, Nov. 19, 2010 (tab. 1), www.springerlink.com/content/h4616862621x8616/ (visited June 23, 2011).

It's a mistake to lump together different types of sex offender. Lisa L. Sample & Timothy M. Bray, "Are Sex Offenders Different? An Examination of Rearrest Patterns," 17 *Crim. Justice Policy Rev.* 83, 93-97 (2006). This defendant's characteristics suggest that he is more dangerous than the average consumer of child pornography. A pedophilic sex offender who has committed both a child-pornography offense and a hands-on sex crime is more likely to commit a future crime, including another hands-on offense, than a defendant who has

committed only a child-pornography offense. Drew A. Kingston et al., "Pornography Use and Sexual Aggression: The Impact of Frequency and Type of Pornography Use on Recidivism Among Sexual Offenders," 34 *Aggressive Behavior* 1, 9 (2008); Michael C. Seto & Angela W. Eke, "The Criminal Histories and Later Offending of Child Pornography Offenders," 17 *Sexual Abuse* 201, 207 (2005) (tab. 3). The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose.

The psychiatrist mentioned none of the relevant scientific literature in assessing the risk of recidivism, see *United States v. McIlrath*, 512 F.3d 421, 424 (7th Cir. 2008), and defense counsel did not suggest that the defendant might be civilly committed, as a continuing menace to society, after completion of his prison term.

The judge's sentencing remarks were cryptic. But the tension we noted earlier between diminished capacity as a mitigating and as an aggravating factor in sentencing makes it difficult for a judge to do more than this judge did, which is to choose. It was an unavoidable choice between incommensurables. *United States v. Gammicchia*, 498 F.3d 467, 469 (7th Cir. 2007). He made clear that he was more concerned with the risk of the defendant's repeating his crimes when released from prison than with the defendant's "issues," which is to say the arguments pressed by defense counsel for lenience. The judge wanted a "guarantee"; that is, he wanted to minimize the risk of recidivism. He was entitled to put incapacitation and specific deterrence ahead of just deserts.

"The more obvious the reasons for the sentence, the less the need to announce them." *United States v. Middagh*, 594 F.3d 1291, 1296 (10th Cir. 2010); see also *Rita v. United States*, *supra*, 551 U.S. at 356. Defense counsel presented scanty evidence and feeble arguments that the defendant would be harmless when released from prison. There wasn't much more for the judge to say in the face of so one-sided a record.

The defendant's final argument is that the provisions of the sentencing guidelines relating to sexual offenses are empirically unsupported, vindictive, and excessively harsh. E.g., *United States v. Grober*, 624 F.3d 592, 603-09 (3d Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 184-88 (2d Cir. 2010); Troy Stabenow, "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines" (2009), www.fd.org/pdf_lib/child%20porn%20july%20revision.pdf (visited June 23, 2011). The argument is more properly addressed to the Sentencing Commission, or to Congress, which has greatly influenced the child-pornography guidelines, *United States v. McNerney*, 636 F.3d 772, 775-78 (6th Cir. 2011), than to an individual district judge in a sentencing hearing. See *United States v. Pape*, 601 F.3d 743, 748-49 (7th Cir. 2010); *United States v. Aguilar-Huerta*, 576 F.3d 365, 367-68 (7th Cir. 2009); *United States v. Lopez-Reyes*, 589 F.3d 667, 671 (3d Cir. 2009). A sentencing judge is not required to "delve into the history of a guideline" in order to satisfy himself that "the process that produced it was adequate"; "sentencing hearings [would] become unmanageable, as the focus shifted from the defendant's conduct to the 'legislative' history of the

guidelines." *United States v. Aguilar-Huerta*, *supra*, 576 F.3d at 368. Judge Hibbler was entitled to limit his consideration to the particular applicable guidelines, which he judged to be appropriate to the defendant's conduct. See *United States v. Maulding*, 627 F.3d 285, 287-88 (7th Cir. 2010); *United States v. Pape*, *supra*, 601 F.3d at 748-49; *United States v. Huffstatler*, 571 F.3d 620, 624 (7th Cir. 2009).

We don't read his remark about the guidelines' being "reasonable" to mean that he was giving them presumptive force, which would be improper. *Rita v. United States*, *supra*, 551 U.S. at 351. He is presumed to know the law (a realistic presumption, given how large sentencing looms in the work of district judges nowadays). He doubtless thought he was giving the defendant the right sentence, not a sentence that he disagreed with and was imposing merely because it was consistent with a guideline that could not be thought unreasonable in general.

The gravity of the defendant's offense should not be denigrated. This case is like *United States v. Goldberg*, 491 F.3d 668, 669, 672 (7th Cir. 2007), where "young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others. [Over a period of some 18 months, Goldberg had downloaded hundreds of pornographic photographic images, some depicting children as young as 2 or 3 being vaginally penetrated by adult males. He offered these images to other subscribers to the web site to induce them to send similar images in return.] The greater the

customer demand for child pornography, the more that will be produced . . . . The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced." Defense counsel could not have picked a less auspicious vehicle for mounting a broad assault on the guideline provisions relating to child pornography.

AFFIRMED.