In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3269

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANCIS ALAN SCHMITZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 361—**Rebecca R. Pallmeyer**, *Judge*.

ARGUED JUNE 5, 2012—DECIDED MAY 29, 2013

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge*. Defendant-Appellant Francis Alan
Schmitz pleaded guilty to a charge of mail fraud and
was ordered to serve 84 months in prison, a term
slightly below the low end of the sentencing range
advised by the Sentencing Guidelines. Schmitz con-
tends that the district court committed two errors in
sentencing him: (1) a procedural error, when it failed to
address his contention that "factor creep" in the Guide-

lines has inflated beyond reason the sentencing range for white collar frauds, and particularly for someone of his age and health; and (2) relied on an erroneous understanding of the timespan of the fraud to which he pleaded guilty. Finding that the district court committed no procedural or factual error in sentencing Schmitz, we affirm.

## I.

Pursuant to a written plea agreement, Schmitz pleaded guilty to one count of a criminal information charging him with mail fraud affecting a financial institution, in violation of 18 U.S.C. § 1341. (A second count charging him with committing bank fraud in violation of 18 U.S.C. § 1344 was dismissed on the government's motion at sentencing.) Beginning in or about July 2003, Schmitz had convinced a series of financial institutions and others to lend him money, ostensibly to invest in real estate development, by telling these institutions that he was the beneficiary of a multi-million dollar trust fund whose assets were available as collateral for the loans. In fact, there was no trust and no trust assets. But Schmitz concocted a convincing trail of paper and digital documents (including trust account statements, tax returns, emails, and letters) making it appear as if there were, going so far as to create a phony financial services firm (with a website and virtual office space) that purportedly held assets of the fictitious trust, and then to file suit in state court against two (fictitious) employees of the (non-existent) firm

claiming that they had mishandled the (non-existent) trust. Ultimately, Schmitz was able to obtain more than $6 million from seven banks and two additional lenders. He used just under half of that total to pay off previous lenders, in Ponzi-like fashion. The rest—roughly $3.1 million—he used to benefit himself and his personal business ventures, and this amount marked the extent of the lenders' collective loss.

The plea agreement anticipated that Schmitz's adjusted offense level would be 28, after a three-level reduction for acceptance of responsibility; that his criminal history category would be I; and that his Guidelines sentencing range would be 78 to 97 months. Despite a skirmish at sentencing as to whether Schmitz had forfeited his entitlement to credit for acceptance of responsibility by submitting to the court a version of his offense that minimized his culpability, the court granted him the three-level reduction after he withdrew his statement and determined his adjusted offense level to be 28, as the parties had anticipated. However, because Schmitz began the charged fraud in 2003, while he was still on supervised release in connection with a prior state conviction, *see* U.S.S.G. § 4A1.1(d) (specifying two additional criminal history points if the defendant committed the offense of conviction while under any criminal justice sentence), the parties agreed, and the court found, that his criminal history category should be II. The resulting advisory Guidelines range was 87 to 108 months in prison.

Schmitz sought a substantially below-Guidelines sentence of 36 months, and among his arguments in sup-

port of a reduced sentence were two that are relevant to this appeal. He contended that the Guidelines specified an excessive sentence for someone convicted of a white collar crime like fraud, and that because his age (60) combined with a variety of health conditions meant he had both a shorter life expectancy and a lower risk of re-offending, a sentence within the advisory range was greater than necessary to serve the statutory sentencing goals set forth in 18 U.S.C. § 3553(a)(2).

The first of these arguments was focused on the substantial lengthening of the Guidelines sentencing range for fraud, larceny, and similar offenses that has occurred over the last two decades. The longer sentences for such offenses are in the main the result of a three-fold increase in the number of specific offense characteristics (from six to 18) incorporated into the fraud guideline, *see* U.S.S.G. § 2B1.1(b), a phenomenon that has been described as "factor creep," *see* R. Barry Ruback & Jonathan Wroblewski, *The Federal Sentencing Guidelines: Psychological and Policy Reasons for Simplification*, 7 Psychol. Pub. Policy & L. 739, 752-53 (2001), coupled with a substantial increase in the number of points imposed for the amount of the loss, a longstanding and central offense characteristic in fraud and theft cases, *see* § 2B1.1(b)(1).[1]

---

[1] Schmitz's fraud, for example, because it inflicted a loss in excess of $2.5 million, called for an 18-point increase in his offense level, *see* § 2B1.1(b)(1)(J) (Nov. 2009); under the 1987

(continued...)

Schmitz contended that the harsher penalties for fraud offenses represented a departure from the philosophy animating the original version of the Guidelines, namely that a short but definite period of incarceration would suffice as a deterrent to most white collar offenders. The sentencing range produced by Schmitz's offense characteristics exemplified the new, more punitive philosophy: With a criminal history category of II, under the 1987 Guidelines, Schmitz's sentencing range would have been 24 to 30 months.[2] Under the 2000 Guidelines, it would have been 47 to 57 months.[3] Under the 2009

---

[1] (...continued)
version of the Guidelines, the same loss amount would have demanded a 12-point increase in the offense level, *see* U.S.S.G. § 2B1.1(b)(1)(M) (Oct. 1987).

[2] Under the 1987 Guidelines, the base offense level would have been 4, *see* § 2B1.1(a); 15 points would have been added for the amount of the loss, *see* § 2B1.1(b)(1)(M); and another two points would have been added because the offense involved more than minimal planning, *see* § 2B1.1(b)(4). As section 3E1.1 in 1987 capped the credit for acceptance of responsibility at two points rather than three, Schmitz's final adjusted offense level would have been 16 points rather than 15, as Schmitz's counsel assumed below. *See* R. 47 at 9.

[3] Under the November 2000 Guidelines, the base offense level would have been 4, *see* § 2B1.1(a); 15 points would have been added for the amount of the loss, *see* § 2B1.1(b)(1)(P); two points would have been added because the offense involved more than minimal planning, *see* § 2B1.1(b)(4)(A); and an additional four points would have been added because
(continued...)

Guidelines, which were used to calculate Schmitz's advisory sentencing range, the range was 87 to 108 months. In short, the range increased by more than 300 percent in the 24 years since the original version of the Guidelines was issued. Schmitz asserted that in adopting much longer sentences, the Sentencing Commission had failed to fulfill its institutional role by shifting sentencing policy to a more punitive model without the support of any empirical data demonstrating the value of such substantial increases. Like Schmitz, we shall refer to this argument as his "factor creep" argument.

Schmitz secondarily argued that for a person of his age and with his health conditions, a within-Guidelines sentence would occupy virtually all of the remaining productive years of his life. Schmitz was 60 years old at time of sentencing, with an average remaining life expectancy of 20.6 years. However, Schmitz also had been diagnosed with high blood pressure, high cholesterol, coronary heart disease, and an enlarged prostate. Schmitz was taking medications for each of these conditions, including Lisinopril and hydrochlorothiazide (for high blood pressure), Simvastatin (for high cholesterol), low-dose aspirin (for the heart), and

---

[3] (...continued)

Schmitz obtained more than $1 million in gross receipts from one financial institution, *see* § 2B1.1(b)(6)(B). Three levels would have been deducted for acceptance of responsibility pursuant to section 3E1.1 (which by this time provided for the third point), bringing Schmitz's final offense level to 22.

Terazosin (for the prostate); and he presented no evidence that any of his conditions was life-threatening or life-shortening even with medication. He nonetheless argued that these conditions distinguished him from other persons convicted of fraud offenses for sentencing purposes in that they reduced his life expectancy as well as his likelihood of re-offending. In Schmitz's view, there was no empirical data to suggest that for someone of his age and health, a within-guidelines sentence was no greater than necessary to achieve deterrence and the other sentencing goals set forth in 18 U.S.C. § 3553(a).

The district court implicitly rejected the first of these arguments and expressly rejected the second. Judge Pallmeyer observed that she agreed with Schmitz's contention that it is the fact rather than length of incarceration that matters for the purpose of deterring white collar criminals (R. 72 at 34-35), which suggests that she had taken note of his policy-based challenge to the fraud guideline. Beyond that one remark, however, she did not address the merits of the challenge. She did address Schmitz's health issues, observing that these conditions were not uncommon for someone of his age, and expressed confidence that adequate treatment was available in prison for them. R. 72 at 33-34.

In passing sentence, Judge Pallmeyer took note of the Guidelines range and indicated that the defense might be right when it contended that a criminal history category of II overstated the extent of Schmitz's criminal background. After addressing Schmitz's health concerns, the judge noted the aggravating and miti-

gating factors that she found relevant. She remarked that Schmitz's fraud had been "longstanding and very comprehensive" (R. 72 at 34); that it had been implemented in a sophisticated way; and that it had injured his family as well as the victims of the offense. On the plus side, she found that Schmitz's remarks at sentencing reflected a genuine acknowledgment of responsibility for his crime. She also commended Schmitz's efforts, during the period of his pre-sentence detention, to teach his fellow inmates how to read. Schmitz's "positive contribution" in the latter regard convinced her that a sentence just below the low end of the Guidelines range was appropriate. As noted earlier, the judge ultimately ordered Schmitz to serve a term of 84 months.

## II.

Schmitz's first contention is that the district court committed procedural error by failing to address his argument that the court should abandon the fraud guideline in determining a reasonable sentence, in that the Sentencing Commission had neglected its institutional role and had allowed factor creep to substantially increase the penalties for fraud offenses without empirical data to suggest that harsher penalties were necessary.

The district court's ultimate obligation is to impose a sentence that is reasonable in light of the sentencing criteria set forth in 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 260-61, 125 S. Ct. 738, 765

(2005); *United States v. Dean*, 414 F.3d 725, 730-31 (7th Cir. 2005). The advisory Guidelines range, accurately determined, provides "'the starting point and the initial benchmark'" for the court's sentencing determination. *Kimbrough v. United States*, 552 U.S. 85, 108, 128 S. Ct. 558, 574 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 596 (2007)); *see also Rita v. United States*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007); *United States v. Smith*, 562 F.3d 866, 872 (7th Cir. 2009). The court must then look to the section 3553(a) factors in order to ascertain the appropriate length of the defendant's sentence. *See Gall*, 552 U.S. at 49-50, 128 S. Ct. at 596-97; *see also*, *e.g.*, *United States v. Vallone*, 698 F.3d 416, 497 (7th Cir. 2012), *pet'n for cert. filed*, No. 12-1056, 2013 WL 703419 (U.S. Feb. 25, 2013). After making its determination, the court must articulate the reasons for its choice of sentence. *United States v. Patrick*, 707 F.3d 815, 818 (7th Cir. 2013). The explanation need not be exhaustive, *see Rita*, 551 U.S. at 356, 127 S. Ct. at 2468, but it must be sufficient to satisfy this court that the sentencing judge has given meaningful consideration to the section 3553(a) factors and the parties' arguments in determining how long the defendant's sentence should be, *see ibid.*; *Patrick*, 707 F.3d at 818-19. This will entail some discussion of any significant argument the defendant has made with respect to his characteristics that might bear on the length of the sentence. *Id.* at 819. Rote and frivolous arguments may be left unmentioned; "'[i]f anyone acquainted with the facts would have known without being told why the judge had not accepted the argument,' then the judge need not specifi-

cally address that point." *Id.* (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)); *see also United States v. Young*, 590 F.3d 467, 474 (7th Cir. 2009). If, on the other hand, a defendant's argument in mitigation has sufficient merit as to cause one to wonder, in the absence of an explanation, why the court rejected it, then the court must address it explicitly. *See Patrick*, 707 F.3d at 819; *United States v. Vidal*, 705 F.3d 742, 744 (7th Cir. 2013).

The court did not commit procedural error in failing to address Schmitz's factor creep argument. That was Schmitz's principal argument for a below-Guidelines sentence, and we often observe that a sentencing judge is obliged to address a defendant's principal argument in mitigation. *See, e.g.*, *Vidal*, 705 F.3d at 744; *United States v. Garthus*, 652 F.3d 715, 718 (7th Cir. 2011) (coll. cases), *cert. denied*, 132 S. Ct. 2373 (2012). But Schmitz's argument was not one addressed to his own characteristics and circumstances. *Cf. Patrick*, 707 F.3d at 819-20 (remanding where district court failed to address defendant's cooperation with authorities, which government itself cited as a basis for below-Guidelines sentence); *Vidal*, 705 F.3d at 744-45 (remanding where district court failed to address defendant's argument that his documented psychiatric issues warranted a below-Guidelines sentence). Rather, his was a categorical challenge to the validity of the fraud guideline, on the ground that the severity of sentences called for by the current incarnation of that guideline is unsupported by any empirical data demonstrating the need for sentences far longer than those called for by the

original 1987 version of the guideline, and that the Sentencing Commission had thus failed its institutional role in adopting the current guideline. Once "*Booker* unbound the sentencing judges from the guidelines," *United States v. Aguilar-Huerta*, 576 F.3d 365, 366 (7th Cir. 2009) (coll. cases), they became empowered to substitute their own views as to the appropriate sentence for a particular crime (and defendant) for the penal theories that inform the pertinent provisions of the Guidelines, *see id.* at 366-67 (coll. cases); *see United States v. Corner*, 598 F.3d 411, 414-15 (7th Cir. 2010) (en banc). Consequently, an argument along the lines of the one Schmitz made is a proper appeal to the judge's discretion to reject a sentence within the Guidelines range. *United States v. Moreno-Padilla*, 602 F.3d 802, 814 (7th Cir. 2010) (citing *Aguilar-Huerta*, 576 F.3d at 367)*.* But because an argument like Schmitz's is a blanket challenge to the guideline rather than one tailored to his unique characteristics and circumstances, it is not one that the district judge must explicitly address. *See United States v. Ramirez*, 675 F.3d 634, 640 (7th Cir. 2011) (per curiam); *Garthus*, 652 F.3d at 721; *Moreno-Padilla*, 602 F.3d at 814; *United States v. Pape*, 601 F.3d 743, 749 (7th Cir. 2010); *Aguilar-Huerta*, 576 F.3d at 367-68. Arguments urging a reexamination of a particular guideline are more naturally addressed to the Sentencing Commission, as we pointed out in *Garthus*. 652 F.3d at 721. Certainly a district court may address such an argument (and must do so, if it chooses to reject the guideline, *see Gall*, 552 U.S. at 51, 128 S. Ct. at 597; *Kimbrough*, 552 U.S. at 109, 128 S. Ct. at 575; *Rita*, 551 U.S. at 357, 127 S. Ct. at 2468;

*Corner*, 598 F.3d at 415; *United States v. Bradley*, 675 F.3d 1021, 1025 (7th Cir. 2012) (per curiam)), but if it is not persuaded by the argument it may pass over it in silence. *See*, *e.g.*, *Moreno-Padilla*, 602 F.3d at 814 ("a district court is not required to delve into the history of a guideline so that it can satisfy itself that the process that produced it was adequate to produce a good guideline") (internal quotation marks and brackets omitted). As we have said, it is clear from the record that Judge Pallmeyer considered the argument but implicitly concluded that the fraud guideline should be applied to Schmitz's conduct. She was perfectly entitled to accept the penal philosophy embodied in the current fraud guideline and was not obligated to explain why she chose to do so. *E.g.*, *Garthus*, 652 F.3d at 721.

Nor do we think that the court committed any error, procedural or otherwise, with respect to Schmitz's health and age. As we have noted, the district judge expressly addressed this argument, but found that none of Schmitz's conditions was out of the ordinary for a person of his age and that all could be appropriately treated during his incarceration. Schmitz contends that the judge's statement is insufficient to explain why the judge thought that a term of seven years was no greater than necessary to deter him from future crimes given his age and health. We disagree. None of the conditions that Schmitz has identified (high blood pressure, high cholesterol, etc.) is out of the ordinary for a 60-year-old. All are amenable to treatment by medication, and Schmitz is in fact taking medications for these condi-

tions. He has presented no evidence that any of his conditions, alone or in combination, is unusual in kind or degree and/or cannot be controlled with medication. Schmitz broadly contends that the prison term ordered by the district court will consume most of the remaining productive years of his life. The record gives us no reason to believe that this is true. Schmitz has been incarcerated since he was arrested in May 2010; thus, by the time he completes his term, he will only be in his mid-60s, which by today's standards does not represent the end of one's active years. On this record, the district court was not required to address Schmitz's argument in any greater detail than it did.

Finally, we do not think that the district court committed a material factual error as to the duration of the charged fraud offense that requires correction. Schmitz's argument in this regard stems from a remark about his "fraud scheme" that the judge made in assessing the gravity of the offense. In context, what the judge said is this:

> I am aware that [Schmitz's] fraud was long-standing and very comprehensive.
>
> Apart from—it appears that since 1996, when Mr. Schmitz left his position with the bank, he really has not been employed in any legitimate, lawful way. He got a severance payment from the bank, as I understand it. He received some social security money via his brother. But *essentially his life since 1996 has been given over to this fraud scheme* in ways that are a mystery to people that—I think were concealed to the people who love him and know him well.

The fact that it was long-standing and comprehen-
sive as it was justifies a substantial prison term,
it seems to me. . . .

* * *

So Mr. Schmitz's offense conduct is very serious.
It was long-standing. It victimized not only the fi-
nancial victims but certainly victimized his family.
His wife, we learned, was unaware of what was
going on and has only been discovering a lot of it
over the months since Mr. Schmitz has been in cus-
tody. And now his family—his marriage is crumbling
and his family is among the victims as well.

R. 72 at 34-35 (emphasis ours). Schmitz interprets the
highlighted remarks as an erroneous finding by the
judge that the charged scheme to defraud the banks
dated back to 1996, some seven-plus years before it
actually began. But what prompted the judge's remark
was the shroud of mystery that enveloped Schmitz's
employment history from 1996 onward. The probation
officer had been largely unable to verify Schmitz's re-
ported work as a consultant in those years (*see* R. 73
PSR at 20-21); the limited, available information as to
Schmitz's income during those years (including what he
had reported to Pretrial Services, and what his wife
had believed he was earning) was inconsistent (*see* R. 73
PSR at 21); and Schmitz's wife, in her own effort to sort
out the couple's finances, "ha[d] discovered an over-
whelming abundance of information indicative of the
defendant's deception throughout the last 15 years" (R. 73
PSR at 18). In context, it is apparent to us that what the

judge meant to say was that since 1996, Schmitz's life had been given over to deception and fraud—a pattern that included the charged offense but was not limited to it. That is a reasonable inference given the inability to pin down what precisely Schmitz was doing, how much money he was earning, and where that money was coming from. The judge's use of the term "fraud scheme" was merely an unfortunate slip of the tongue.

The judge could not have been laboring under a misunderstanding that the charged scheme to defraud had begun as early as 1996. The criminal information (R. 9 at 2), the plea agreement (R. 21 at 3), the remarks by both the prosecutor and Schmitz at the change of plea hearing (R. 71 at 16-17, 28), and the parties' pre-sentencing memoranda (R. 23 at 3-4; R. 27 at 1; R. 52 at 2) all indicated to the court that the charged scheme began in or about 2004. In her presentence report, the probation officer advocated pushing that date back to July 2003, so as to take account of a bank loan that Schmitz had fraudulently obtained at that time from CitiFinancial (and which he later paid off). R. 73 PSR at 4-5.[4] It was because Schmitz committed that

---

[4] The probation officer's view was consistent with the probable cause affidavit that a postal inspector had prepared in support of the original criminal complaint that resulted in Schmitz's arrest. *See* R. 1 at 3 ¶ 5 ("The investigation to date has focused on allegations that since at least in or about 2003, [Schmitz] has fraudulently attempted to obtain millions of

(continued...)

fraud while he was still on supervision from a 2001 conviction for credit card fraud that the probation officer added points to Schmitz's criminal history which placed him in category II and not I. U.S.S.G. § 4A1.1(d); R. 73 PSR at 16. This was a matter that the parties addressed in their pre-sentencing memoranda and that the court resolved (in favor of the probation officer's view) at the sentencing hearing. R. 72 at 5, 6, 13, 16-17.

In sum, the district court's mistake (if any) lay in its word choice rather than any misapprehension as to the beginning and duration of the charged scheme. We therefore discern no need to remand the case for clarification on this point. It was a plausible inference that Schmitz's history of fraud began well before the charged scheme did; and we do not think there is any real possibility that the sentencing judge blurred the distinction between the two in evaluating the pertinent sentencing factors. For example, standing alone, the charged scheme, which lasted well over six years, was both serious and lengthy, as the court said it was. In short, there is no real possibility that the court was mistaken about the duration of the charged crime, let alone that such an error affected the court's evaluation of the Guidelines and statutory factors and its choice of sentence.

---

[4] (...continued)
dollars of loan proceeds from at least seven different lenders, including financial institutions. . . .").

### III.

Having concluded that the district court committed no procedural or factual error in sentencing Schmitz, we AFFIRM his sentence.