In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 15-3117 & 15-3261

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICK E. BROWN & MARY C. TALAGA,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:13-cr-00854-1, 1:13-cr-00854-3 — **Gary Feinerman**, *Judge.*

ARGUED MAY 23, 2017 — DECIDED JANUARY 19, 2018

Before BAUER, EASTERBROOK, and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A grand jury indicted Rick E. Brown and Mary C. Talaga with one count of conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349, six counts of health-care fraud, in violation of 18 U.S.C. § 1347, and three counts of falsifying a matter or providing false statements, in violation of 18 U.S.C. § 1035(a). A jury convicted them on all counts. The district court sentenced Mr. Brown to eighty-seven months' imprisonment on the health-care fraud

counts and terms of sixty months' imprisonment on each of the falsification counts to run concurrently with each other and with the fraud counts. In doing so, the district court explained that a significant sentence was warranted for several reasons, including general deterrence. Ms. Talaga was sentenced to concurrent forty-five-month sentences on all of the ten counts.

Both defendants now maintain that the district court erred in imposing their respective sentences. Mr. Brown maintains that the district court's assumptions about the need for general deterrence were unfounded and constituted procedural error. Ms. Talaga argues that, when the district court calculated the amount of loss for which she was responsible, it impermissibly included losses that occurred before she joined the conspiracy. The inclusion of these amounts resulted in a higher loss amount, corresponding to a higher offense level and sentence.

Because the district court did not err in its reasoning or in its sentencing determination, we affirm its judgments.

# I

## BACKGROUND

### A.

Medicall Physicians Group, Ltd. ("Medicall"), a company that provided home physician visits to patients, employed both Mr. Brown and Ms. Talaga. Mr. Brown served as Medicall's office manager, and Ms. Talaga had responsibility for medical billing. Dr. Roger Lucero, a third defendant, was the owner and medical director of the company. He pleaded

guilty to the conspiracy count, cooperated with the Government, and testified against both Mr. Brown and Ms. Talaga.

Beginning at least as early as January 2007, Mr. Brown and Dr. Lucero began submitting false and fraudulent claims to Medicare. Ms. Talaga, who had been trained as a medical biller, joined Medicall in August 2007. She reported to Mr. Brown and was paid a percentage of Medicall's earnings.

According to the evidence, the fraud at Medicall took at least three forms. First, Mr. Brown and Ms. Talaga billed Medicare for "prolonged" visits, using the prolonged care code, as a way to pay for employees' travel time. Second, regardless whether the patient qualified for, or received, the billed-for care, every patient was billed for "Care Plan Oversight," a type of physician supervision for patients requiring complex or multi-disciplinary care. Finally, Mr. Brown and Ms. Talaga billed Medicare for services purportedly provided to deceased patients, as well as services by providers who no longer were associated with Medicall.

After hearing the evidence, the jury convicted both defendants on all counts of the indictment.

## 1. Mr. Brown

The probation office prepared a presentence report ("PSR") for Mr. Brown. The PSR calculated a base offense level of six under U.S.S.G. § 2B1.1(a)(2), and then applied an eighteen-level increase under § 2B1.1(b)(1)(J) for an intended loss of approximately $4.3 million. The PSR also applied (1) a two-level increase for a federal health-care offense involving a loss of more than $1 million but less than $7 million; (2) a two-level increase for use of sophisticated means; (3) a

four-level increase for being a leader or organizer; and (4) a two-level increase for obstruction of justice because Mr. Brown had testified falsely at trial about his role in the offense. These increases yielded a total offense level of thirty-four that, when combined with Mr. Brown's criminal history category of I, yielded a sentencing range of 151 to 188 months.

Mr. Brown objected to various aspects of the PSR's calculation. The district court agreed with Mr. Brown that the fraud did not involve sophisticated means. It also gave Mr. Brown the benefit of the loss table in the new Guidelines, which yielded a sixteen-level increase, as opposed to an eighteen-level increase, for amount of loss. When combined with Mr. Brown's criminal history category, the new calculation yielded a guidelines range of 121 to 151 months.

The district court then considered "the 3553(a) factors one by one."[1] It also observed that "[s]ubsection (a)(2) requires the Court to consider the need for the sentence imposed to accomplish the various purposes of criminal punishment. The first purpose is to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."[2] The court considered the crimes to be "serious" because they occurred "over an extended period of time" and involved "$4.3 million in false claims."[3] The second purpose

---

[1] R.386 (1:13-cr-00854-1) at 95.

[2] *Id*. at 100.

[3] *Id*. at 95.

articulated in 18 U.S.C. § 3553(a) "is to afford adequate deterrence to criminal conduct."[4] The court considered this purpose "a significant factor" because Medicare fraud unfortunately is widespread "in this country; and those who are in the medical field and who are tempted to engage in fraud must know, they have to know, that the penalties are severe, particularly given the low likelihood of getting caught."[5] The court stated that it agreed with the Government

> that people in the healthcare business and in the home healthcare business in particular will know about this sentence, and this sentence has to send a signal. It's not the only consideration, and it's not the most important consideration, but it is a consideration that 3553(a)(2)(B) directs me to consider, and I do have to consider that.[6]

Finally, the court noted that, with respect to specific deterrence, it was "highly unlikely" that Mr. Brown would commit a crime in the future.[7] The court then sentenced Mr. Brown to eighty-seven months' imprisonment.

The court reiterated many of these considerations in its oral statement of reasons:

> I don't think that anything less than 87 months would be sufficient to fulfill the purposes of 3553(a), and here's why: The duration

---

[4] *Id*. at 100.

[5] *Id*.

[6] *Id*. at 101.

[7] *Id*.

of the scheme. It went on for several years. This wasn't a momentary slip … . This was a sustained course of knowing criminal conduct.

The amount actually stolen, over $1.3 million. That's a lot of money.

I'm going to come back to general deterrence. This is a white collar crime, so the sentence imposed here is far more likely to have a deterrent effect on Mr. Brown's cohorts, those also involved in the medical profession, than a sentence in a drug case or an illegal re-entry case.

I do agree … that people in the healthcare field, people who are business—men and women who are business people, they engage in a cost/benefit analysis. And the benefit is the benefit if you don't get caught, and the cost is the probability of getting caught multiplied by the sanction.

And there's a low probability of getting caught, so the sanction has to be serious. It has to be real, if there's any hope of ensuring that at least when people look at the cost and the benefits, when they're contemplating fraud, that they realize that cost will outweigh the benefits.

> And finally, there's Mr. Brown's failure to
> accept responsibility, and in particular his repe-
> tition of the claim … that he wasn't responsible
> for the fraud.[8]

### 2. Ms. Talaga

The probation office also prepared a PSR for Ms. Talaga. It set her base offense level at six pursuant to § 2B1.1, and applied an eighteen-level increase for the amount of loss (greater than $2.5 million, but less than $7 million). It also included a two-level increase for use of sophisticated means and a two-level increase for a federal health-care offense. These determinations yielded an offense level of twenty-eight that, when combined with a criminal history category of I, yielded a guidelines range of seventy-eight to ninety-seven months.

Ms. Talaga objected to various aspects of the PSR. Her primary argument was that the intended loss amount should be reduced. She submitted that her "intended loss could not have been more than the amount that Medicare actually paid because Ms. Talaga knew that Medicall … would not have obtained the full $4M+ that Medicall … fraudulently billed."[9] Specifically, she noted that an application note to the fraud guideline states "that the aggregate dollar amount of fraudulent bills 'is evidence sufficient to establish the amount of [the]

---

[8] *Id*. at 105–06.

[9] R.242 (1:13-cr-00854-3) at 1.

intended loss, *if not rebutted*' by the defendant."[10] She claimed that

> [u]nlike co-defendants Rick Brown and Dr. Roger Lucero, [she] "was intimately familiar with the billing procedures of the medical practice" as well as with 42 U.S.C. § 1395w-4(a)(1), which provides that Medicare can never pay any more than "the amount determined under the Medicare fee schedule." The Government's own investigation establishes that Ms. Talaga successfully completed "Medical Billing," a course at Triton Junior College, and the "Medical Billing" course syllabus explains than the course is "all about Medicare and medical billing problems," but that the course covers mostly Medicare issues. Further, Triton College staff and a Triton Medical Billing course professor confirmed that the course "cover[s] in depth" the Medicare regulation that Medicare can never pay any more than the Medicare fee schedule. Even aside from Ms. Talaga's schooling, Ms. Talaga would have had to have understood Medicare's payment practices because her income was based entirely on Medicare payment amounts with respect to her submitted bills to Medicare.[11]

---

[10] *Id*. (quoting U.S.S.G. § 2B1.1 cmt. n.3(F)(viii)).

[11] *Id*. at 3–4 (footnotes omitted).

Consequently, she claimed, she had rebutted the Government's prima facie case.

Ms. Talaga also argued that the amount of loss should be decreased because she did not recognize that she was committing fraud when she first began at Medicall.[12] Ms. Talaga pointed to the testimony of another biller, Arian Shogren, who testified that Mr. Brown told her that all patients actually were receiving Care Plan Oversight. At first, Shogren stated that she believed Mr. Brown; however, "she recognized the fraud 'at the end' of her time working at Medicall."[13] Ms. Talaga submitted that she, similarly, did not recognize the fraud at the outset.

The court accepted that, as an experienced biller, she would be familiar with Medicare's reimbursement levels. Therefore, concluded the court, Ms. Talaga should not be responsible for the amount of all the false claims, but only those that fell within the reimbursement schedule set by Medicare. Thus Ms. Talaga's amount of loss was reduced to $3.262 million.[14] The court also reduced Ms. Talaga's loss amount by $222,000 for the few months during the conspiracy that she did not work for Medicall. These reductions, however, did not result in a reduction in offense level.

The court rejected Ms. Talaga's argument that she should not be responsible for fraudulent billings from the beginning

---

[12] *See id*. at 6.

[13] *Id*. (footnote omitted).

[14] *See* R.387 (1:13-cr-00854-3) at 34–35.

of her tenure.[15] The court found by the preponderance of the evidence that a seasoned and trained medical biller would have realized, from the outset, that not every single patient was receiving Care Plan Oversight, that the number of hours being billed for Care Plan Oversight could not be reconciled with the number of actual services that Dr. Lucero was performing, and that she did not have the required documentation for the bills that she was submitting.[16]

Giving Ms. Talaga the benefit of the upcoming amended schedule, the court calculated a new guidelines range of fifty-one to sixty-three months. After considering the § 3553(a) factors, the court imposed a sentence of forty-five months' imprisonment.

Both Mr. Brown and Ms. Talaga timely appealed their sentences.

## II

## DISCUSSION

Both Mr. Brown and Ms. Talaga maintain that the district court committed procedural error when imposing their sentences. "Whether a district court followed proper sentencing procedure is a question of law that we review de novo." *United States v. Olmeda-Garcia*, 613 F.3d 721, 723 (7th Cir. 2010).

> To ensure that the sentencing judge did not commit any "significant procedural error," we

---

[15] *See id*. at 29.

[16] *See id*.

> examine whether the district court: i) properly calculated the Guidelines range; ii) recognized that the Guidelines range was not mandatory; iii) considered the sentencing factors in 18 U.S.C. § 3553(a); iv) selected a sentence based on facts that were not clearly erroneous; and v) adequately explained the chosen sentence including an explanation for any deviation from the Guidelines range.

*United States v. Lockwood*, 840 F.3d 896, 900 (7th Cir. 2016) (quoting *Gall v. United States*, 552 U.S. 38, 53 (2007)). We consider first Mr. Brown's claim of error and then turn to Ms. Talaga's.

## A.

With respect to Mr. Brown, the district court properly calculated the guidelines range, recognized its ability to depart from the Guidelines, considered all of the § 3553(a) factors, and imposed a sentence that was thirty-four months *below* the guidelines range—a sentence that the court characterized as "a significant downward variance."[17] The court noted that four factors prevented it from departing further: the duration of the scheme, the amount of the fraud, the need for general deterrence, and Mr. Brown's failure to accept responsibility.[18]

---

[17] R.386 (1:13-cr-00854-1) at 103.

[18] *See id*. at 105–06.

All of these factors are legitimate considerations for the court to take into account. *See* 18 U.S.C. § 3553(a).

Mr. Brown maintains, however, that the district court committed procedural error because it relied on "unfounded" assumptions in articulating a need for general deterrence.[19] Specifically, Mr. Brown questions the district court's belief that would-be white-collar criminals engage in cost-benefit analyses in deciding whether to engage in illicit activities. He further questions the court's application of this principle to the health-care context, specifically that, given the "low probability of getting caught,"[20] a serious penalty was necessary to deter others from engaging in this kind of crime.[21]

We previously have endorsed the idea that white-collar criminals "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860–61 (7th Cir. 2015). They are, therefore, "prime candidates for general deterrence." *Id.* at 860 (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)). Our approach comports with that of our sister circuits. *See United States v. Musgrave*, 761 F.3d 602,

---

[19] Appellant Brown's Br. 35.

[20] R.386 (1:13-cr-00854-1) at 100 (observing that Medicare fraud unfortunately is widespread "in this country" and that "those who are in the medical field and who are tempted to engage in fraud must know … that the penalties are severe, particularly given the low likelihood of getting caught").

[21] *Id.* at 105 ("[M]en and women who are businesspeople, they engage in a cost/benefit analysis. And the benefit is the benefit if you don't get caught, and the cost is the probability of getting caught multiplied by the sanction.").

609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quoting *Peppel*, 707 F.3d at 637)); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (using language identical to that in *Musgrave*); *cf. United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (noting that "high sentences" were necessary to alter the calculus "that insider trading 'was a game worth playing'"). The district court, therefore, did not err in relying on such a widely accepted principle.

The district court was entitled to conclude that, given that health-care fraud is widespread and that therefore there is a lower likelihood of getting caught, a serious penalty was necessary to ensure deterrence. At sentencing, the Government specifically brought to the district court's attention that "the Medicare program has imposed a moratorium on additional companies joining the program to provide home healthcare services because it is–the fraud in the area is so prevalent."[22] Mr. Brown did not dispute this assertion, either by way of argument or contrary evidence.[23] Indeed, in his brief to this

---

[22] *Id*. at 71.

[23] Indeed, any such argument by Mr. Brown would have been unfounded because the Centers for Medicare & Medicaid Services did extend its moratorium on new home health agencies in Chicago, among other metropolitan areas, based on the "significant potential for fraud, waste, or abuse." Medicare, Medicaid, and Children's Health Insurance Programs: Announcement of the Extension of Temporary Moratoria on Enrollment of Part B Non-Emergency Ground Ambulance Suppliers and Home Health

court he acknowledges that "white collar crimes such as health care fraud, public corruption, and the like, seem to continue unabated."[24]

Mr. Brown also submits, however, that "[s]ome press releases and news articles leading up to Brown's September 2015 sentencing hearing include rather dramatic statistics about the success of intensified law enforcement efforts in the area of Medicare fraud."[25] Given these increased efforts and the publicity they received, Mr. Brown suggests that "it is difficult to understand how the district court could have so heartily agreed with the proposition that white-collar offenders in Brown's field are less likely to get caught."[26] Mr. Brown never invited the district court's attention to these press releases and articles. Therefore, we can hardly fault the court for not considering them. "[S]entencing judges cannot be expected to rely on evidence not before them." *United States v. Reibel*, 688 F.3d 868, 872 (7th Cir. 2012).

Moreover, even if this material had been presented to the district court, it would not have required the court to alter its conclusion that those who engage in Medicare fraud have a "low likelihood of getting caught."[27] In determining the importance of deterrence in crafting a sentence, the sentencing

Agencies in Designated Geographic Locations, 82 Fed. Reg. 2363 (Jan. 9, 2017).

[24] Appellant Brown's Br. 41.

[25] *Id*. at 37–38.

[26] *Id.* at 39.

[27] R.386 (1:13-cr-00854-1) at 100.

court must answer the situation from the perspective of the prospective offender. From that perspective, the likelihood of getting caught depends not simply on the amount of resources that the Government expends on a particular type of crime, but the frequency with which the particular crime is committed and the ease with which it can be committed and go undetected. Indeed, Mr. Brown observed in his brief that "health care fraud … seem[s] to continue unabated."[28] The vast size and complexity of the Medicare program makes fraud detection especially difficult.[29] Indeed, the unique problems faced in detecting fraud in the home-health-care industry prompted the Centers for Medicare & Medicaid Services to extend its moratorium on new home-health-care agencies in Chicago—a fact specifically brought to the district court's attention.[30] In short, because of the magnitude of the Medicare program, an increase in resources would not necessarily result in a potential offender determining that there is a meaningful increase in the likelihood of detection. The district court did not err, therefore, in resting its conclusion about the need

---

[28] Appellant Brown's Br. 41.

[29] The Government Accountability Office continues to designate "Medicare as a high-risk program … due to its size, complexity, and susceptibility to mismanagement and improper payments." Gov't Accountability Office, *High Risk Series* 520 (2017), https://www.gao.gov/assets/690/682765.pdf; *see also United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (observing that "deterrence is an important factor in the sentencing calculus because health care fraud is so rampant that the government lacks the resources to reach it all").

[30] *See* R.386 (1:13-cr-00854-1) at 71.

for general deterrence on the basis that there was a low likelihood of getting caught for Medicare fraud.

Mr. Brown maintains, however, that his case is indistinguishable from *United States v. England*, 555 F.3d 616 (7th Cir. 2009), and other cases in which we have found error because the district court based the sentence on unfounded assumptions. In *England*, the defendant, while incarcerated, threatened witnesses over the telephone and later was convicted of threatening force against a witness, his brother-in-law. At sentencing, the court articulated the belief that, had the defendant been out on bond, he would have armed himself and used "what degree of force … was necessary to get them to drop the charges against him." *Id*. at 620–21 (internal quotation marks omitted). The district court, therefore, determined that the appropriate guideline was § 2A2.1, "Assault with Intent to Commit Murder; Attempted Murder," and that the nature of the offense warranted a sentence within the attempted-murder guideline range. *Id.* at 618–19. On appeal, we evaluated whether the district court's findings "were sufficiently 'based on reliable evidence' to satisfy due process, or if they amount[ed] to speculation, albeit informed, that f[ell] short of satisfying due process requirements." *Id*. at 622 (quoting *United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007)). We explained that

> [t]he preponderance of the evidence standard satisfies due process in a case, such as this one, where the district court sentences a defendant based on the guideline for a crime the court believes the defendant would have committed if out of prison on bond. Simply put, the question

> here is whether a preponderance of the evidence supports the court's *belief* that the defendant *would have* committed the crime. Adhering to such a standard operates to preclude a sentencing court from sentencing defendants for crimes not sufficiently supported by reliable evidence.

*Id*. In *England*, we were "unable to conclude that a preponderance of the evidence buttresse[d] the court's belief that England would have" committed the crime of attempted murder because all of the defendant's family, including the threatened witness, "testified that they did not feel threatened by England's statements" but "that England was merely 'blowing off steam' in issuing threats." *Id*. at 623. "[B]ecause the evidence appear[ed] at least in equipoise," the preponderance of the evidence standard was not met. *Id*.

Mr. Brown's situation stands in stark contrast to the defendant in *England*. In *England*, the district court drew conclusions about England's individual conduct, which were not supported by a preponderance of the evidence, to determine England's presumptive guideline range and then sentenced England within that range. Here, however, the factual foundations for the district court's guideline calculation are sound. Moreover, the district court's statements regarding white-collar crime and the prevalence of Medicare fraud are not unfounded assumptions but are grounded in case law, in the record, and in common sense.[31]

---

[31] The other cases on which Mr. Brown relies are equally unhelpful. In *United States v. Halliday*, 672 F.3d 462 (7th Cir. 2012), the district court, in

Here, Mr. Brown faults the district court for not addressing and accepting his policy argument, based on penological studies, that "it is the certainty of conviction rather than the length of sentence that serves to deter."[32] In the district court, the only mention of these studies was at the sentencing hearing. Defense counsel stated:

---

reviewing § 3553(a) factors, stated that "Halliday believed [child pornography] was 'victimless' and that he did not 'believe any of this is criminal.'" *Id*. at 474. However, there was no evidence in the record for the court's conclusions; the "statements about Halliday's belief that the crimes at issue were 'victimless' were pure speculation." *Id*. at 475. Here, the court's statement about the low likelihood of being caught for health-care fraud is grounded in the fact that Medicare fraud, and specifically home-health-care fraud, is prevalent, a fact that explicitly was raised during sentencing.

Similarly in *United States v. Bradley*, 628 F.3d 394, 395 (7th Cir. 2010), the district court imposed a sentence that was 169 months *above* the guidelines range. The district court believed a severe penalty was necessary because, according to the court, the defendant had a long, undiscovered history of engaging in sexual activity with minors. However, there was no evidence in the record that the defendant had engaged in sexual activity with any minor except for the victim. In reviewing the sentence, we observed that the district court had made "a questionable … prediction about future conduct based on rank speculation about other, multiple instances of deviant behavior." *Id*. at 401. Here, the court did not engage in any speculation about the defendant's past or future conduct, and speculation was not used to justify an above-guidelines sentence. *Cf. United States v. Martin*, 718 F.3d 684, 688 (7th Cir. 2013) (noting that, "although we have held that a district court's unfounded speculation that sex offenders are not deterrable may necessitate remand, we have done so only where the court imposed an above-guidelines sentence for purposes of deterrence" (citation omitted)).

[32] Brown's Reply Br. 3.

> I'll just note briefly that the statute only requires adequate deterrence, not maximal deterrence with the sentence the Court imposes. And I would also add that studies have shown that it's really the certainty of punishment that drives people more in terms of deterrence than the actual severity or even the swiftness of the imposition of punishment.[33]

For these reasons, counsel urged, "even a modest prison term for Mr. Brown could send that adequate message to society that law enforcement can and will investigate you for Medicare fraud."[34] The district court did not have before it any specific studies. Indeed, Mr. Brown did not bring specific studies to this court's attention until his reply brief.[35]

There is no question that, from a procedural perspective, the district court addressed and rejected this argument. In its statement of reasons, the court stated that it "agree[d] with [Government counsel] that people in the healthcare field … engage in a cost/benefit analysis. And the benefit is the benefit if you don't get caught, and the cost is the probability of getting caught multiplied by the sanction."[36]

The district court was under no obligation to accept or to comment further on Mr. Brown's deterrence argument. In *United States v. Schmitz*, 717 F.3d 536, 542 (7th Cir. 2013), the

---

[33] R.386 (1:13-cr-00854-1) at 61.

[34] *Id.*

[35] *See* Brown's Reply Br. 3–4.

[36] R.386 (1:13-cr-00854-1) at 105.

defendant pleaded guilty to mail fraud, and the resulting guidelines sentence was 87 to 108 months. Before the district court, the defendant argued that the recently increased "penalties for fraud offenses represented a departure from the philosophy animating the original version of the Guidelines, namely that a short but definite period of incarceration would suffice as a deterrent to most white collar offenders." *Id*. at 539. The district court, without explicitly addressing this argument, sentenced Schmitz to a term of eighty-four months.

On appeal, we determined that Schmitz's argument was "not one addressed to his own characteristics and circumstances," but "was a categorical challenge to the validity of the fraud guideline, on the ground that the severity of sentences called for by the current incarnation of that guideline is unsupported by any empirical data demonstrating the need" for longer sentences. *Id*. at 542. Because it was a "blanket challenge to the guideline rather than one tailored to [the defendant's] unique characteristics and circumstances, it [wa]s not one that the district judge [had to] explicitly address." *Id*. Moreover, the district court "was perfectly entitled to accept the penal philosophy embodied in the current fraud guideline and was not obligated to explain why [it] chose to do so." *Id*.; *see also United States v. Hancock*, 825 F.3d 340, 344 (7th Cir. 2016) (quoting *Schmitz* for the proposition that a district court need not address Hancock's policy argument that "the Guidelines' offense-level increases for receipt, transport, possession, or distribution of child-pornography, fit poorly with modern practical realities" and specifically reiterating that "the district judge was 'perfectly entitled to accept the penal philosophy embodied in the current [child-pornography] guideline'" (alteration in original)).

Like the district courts in *Schmitz* and *Hancock*, here the district court was "perfectly entitled to accept the penal philosophy embodied" in the Guidelines that societal goals are served by increasing fraud sentences to reflect the amount of loss, as opposed to imposing only nominal sentences. We find no substantive or procedural error in the district court's imposition of sentence on Mr. Brown.

**B**.

We turn now to Ms. Talaga's sentence. She takes issue with one of the factual bases on which the court's calculation of loss rests. Specifically, she claims that the district court's calculation of loss should not include amounts for claims dating back to 2007 because the Government did not prove that she was aware at that time that the claims were fraudulent. We review the district court's determination of loss for clear error, *see United States v. Diamond*, 378 F.3d 720, 726 (7th Cir. 2004), and will reverse the district court "only if we are left with the definite and firm conviction that a mistake was made," *United States v. Bryant*, 557 F.3d 489, 497 (7th Cir. 2009) (internal quotation marks omitted).

The record supports the district court's conclusion that, in 2007, Ms. Talaga would have known that her submissions were fraudulent. Before the district court, Ms. Talaga argued that she had training in Medicare billing and "was intimately familiar with the billing procedures of the medical practice."[37]

---

[37] R.242 (1:13-cr-00854-3) at 3 (internal quotation marks omitted).

She also submitted documentation of her successful completion of a course at Triton Junior College on Medical Billing that was "all about Medicare and medical billing problems."[38] Consequently, she maintained that her intended loss should be based on what Medicare actually paid, not what was billed, because she "knew that Medicall … would not have obtained the full $4M+ that [it] fraudulently billed."[39] The district court accepted this argument to reduce Ms. Talaga's amount of loss to $3.262 million. This same evidence supports the district court's conclusion that Ms. Talaga would have recognized from the outset that there was a problem with billing *every* patient for Care Plan Oversight, that the numbers of hours for Care Plan Oversight could not be reconciled with the number of hours that the physicians spent performing other services, and that there was a lack of documentation to support the claims she was submitting.[40]

Having convinced the district court of her expertise, Ms. Talaga now tries to discount the training she received. As we already have noted, however, in addition to her formal education, Ms. Talaga was an experienced Medicare biller when she arrived at Medicall. There was testimony that she performed her work quickly, that she knew how to re-code rejected claims so that they would be paid, and that she trained other staff.[41] The district court reasonably concluded

---

[38] *Id*. at 3–4 (internal quotation marks omitted).

[39] *Id*. at 1.

[40] *See* R.387 (1:13-cr-00854-3) at 29.

[41] *See* R.374 (1:13-cr-00854-3) at 100 (Trial Tr. 346).

that, based on Ms. Talaga's training and experience, she would have recognized, based on the sheer volume of claims for Care Plan Oversight (totaling up to three weeks per month of Dr. Lucero's time),[42] that these claims were fraudulent.

Ms. Talaga also submits that other evidence in the record undermines the court's conclusion that she would have recognized the fraud. Ms. Talaga points to the testimony of another Medicall biller, Arian Shogren, who stated that she initially believed that all patients actually were receiving Care Plan Oversight. However, Shogren did not have experience with Medicare billing before she began working at Medicall. Indeed, when she began working at Medicall, she was a technician who did scheduling, took vitals, and kept track of patients' medications.[43] Later, she performed some billing after receiving training from Ms. Talaga.[44] Consequently, the fact that she did not immediately recognize the fraud does not suggest that Ms. Talaga, an experienced biller, also failed to do so.

Second, Ms. Talaga observes that one Government witness, Kelly Hartung, gave conflicting definitions of Care Plan Oversight. In her view, because the Government's own witness could not articulate consistently a definition for Care Plan Oversight, it "is unrealistic" to expect that she would

---

[42] *See* R.265 (1:13-cr-00854-3) at 9 (citing Gov't Trial Ex. 7-S).

[43] *See* R.375 (1:13-cr-00854-3) at 6–7 (Trial Tr. 402–03).

[44] *Id*. at 9–10 (Trial Tr. 405–06).

have been able to recognize that the bills for Care Plan Oversight were fraudulent.[45] However, the fact that Hartung had difficulty articulating the definition of Care Plan Oversight during cross-examination[46] does not negate the fact that Ms. Talaga, as a trained Medicare biller, knew when it was appropriate to bill for Care Plan Oversight and knew that Care Plan Oversight bills—in such a high volume that they represented the bulk of Dr. Lucero's time—were fraudulent.

Ms. Talaga has not established that the district court committed clear error in holding her responsible for fraudulent claims from the beginning of her tenure with Medicall. We therefore affirm her sentence.

## Conclusion

For the foregoing reasons, we affirm the district court's judgments with respect to the sentences of Mr. Brown and Ms. Talaga.

AFFIRMED

---

[45] Appellant Talaga's Br. 10–11.

[46] *See* R.373 (1:13-cr-00854-3) at 40–49 (Trial Tr. 127–36).